**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JEFFREY CLARKE,<br>On behalf of himself and all others<br>similarly situated, | ) ) ) ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| SURDEX CORPORATION, | ) | FLSA COLLECTIVE ACTION |
| | ) | |
| and | ) | |
| | ) | |
| HOFFMANN AVIATION SERVICES, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BOWMAN CONSULTING GROUP, LTD., | ) | |
| | ) | |
| Defendants. | ) | |

**COLLECTIVE ACTION COMPLAINT**

Plaintiff Jeffrey Clarke ("Plaintiff" or "Plaintiff Clarke"), on behalf of himself and all similarly situated individuals, hereby states and alleges as follows for his claim against the above-named defendants (collectively, "Defendants"):

**PRELIMINARY STATEMENT**

1.      This is a collective action to recover unpaid overtime wages and liquidated damages pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*.

2.      Defendants operate an aerial mapping and surveying business that utilizes "survey pilots" to perform flight operations and data collection for clients throughout the United States.

3.      Defendants employ survey pilots on rotational schedules of 15 consecutive days on duty followed by 13 consecutive days off duty. During their on-duty rotations, Defendants' survey

1

pilots regularly work more than 40 hours per workweek.

4. Defendants' policy and practice has been to misclassify its survey pilots as "exempt" under the FLSA to avoid paying them overtime compensation for hours worked over 40 in a workweek.

5. The "Putative Collective Action Members" are those similarly situated individuals to Plaintiff who worked as survey pilots for the above-named Defendants during the applicable limitations period and who have not been fully compensated for earned overtime compensation.

6. Plaintiff prays that all similarly situated workers be notified of the pendency of this action to apprise them of their rights and provide them an opportunity to opt-in to this lawsuit.

7. Plaintiff also asserts an individual claim for unpaid overtime compensation under Missouri's wage laws that is not pursued on behalf of the putative collective action members.

### PARTIES, JURISDICTION, AND VENUE

8. Plaintiff Jeffrey Clarke is a citizen and resident of the State of Georgia. Plaintiff Clarke submits a consent-to-join form with his initial Complaint as Exhibit 1 attached hereto.

9. Defendant Surdex Corporation ("Surdex") is a Missouri corporation with its principal place of business in Chesterfield, Missouri. Surdex conducts business in Missouri and throughout the United States. Surdex can be served through its Missouri Registered Agent: Legalinc Corporate Services Inc., 12747 Olive Blvd, Suite 300A, Saint Louis, MO 63141.

10. Defendant Hoffmann Aviation Services, Inc. ("Hoffmann") is a Missouri corporation with its principal place of business in Chesterfield, Missouri. According to the Missouri Secretary of State's website, Hoffmann dissolved in 2025. Hoffmann can be served through its last Missouri Registered Agent: CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, MO 65101.

11.     Defendant Bowman Consulting Group Ltd. ("Bowman") is a Delaware corporation with its principal place of business in Reston, Virginia. Bowman conducts business throughout the United States, including Missouri. Bowman can be served through its Missouri Registered Agent: Legalinc Corporate Services Inc., 12747 Olive Blvd, Suite 300A, Saint Louis, MO 63141.

12.     Defendants own and operate a flight operations facility and hangar located in Chesterfield, Missouri, at the Spirit of St. Louis Airport (the "Chesterfield Facility"). At all times relevant, the Chesterfield Facility served as Defendants' primary business location for their aerial mapping and surveying business.

13.     Plaintiff and the Putative Collective Action Members reported out of the Chesterfield Facility, received their flight assignments and operational instructions from personnel based at the Chesterfield Facility, and reported to Defendants' chief pilot, schedulers, and other staff who were based at the Chesterfield Facility.

14.     This Court has personal jurisdiction over Defendants because each Defendant has substantial contacts with the State of Missouri, which are purposefully directed to the State of Missouri, through their joint operation of the Chesterfield Facility and employment of survey pilots in Missouri.

15.     Moreover, Surdex and Hoffmann have maintained their respective principal places of business in Chesterfield, Missouri, and all Defendants unlawfully withheld earned overtime wages from Plaintiff and the Putative Collective Action Members in Missouri.

16.     This Court has original federal question jurisdiction under 28 U.S.C. § 1311 for the claim brought under the FLSA, 29 U.S.C. § 201, *et seq*.

17.     This Court has supplemental jurisdiction over Plaintiff Clarke's state law claim (pursued individually) pursuant to 28 U.S.C. § 1367(a) because that clam is so related to the federal

3

claim in this action that it forms part of the same case or controversy.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants conduct business in this District, Surdex maintains its principal place of business in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## RELATIONS OF ENTITIES

19.     For years, Surdex operated as an independent company and employed Plaintiff and the Putative Collective Action Members as survey pilots.

20.     In around early 2024, Bowman announced its intent to acquire Surdex.

21.     To carry out the acquisition, Bowman created a separate entity – Bowman Atlas LTD. – which it merged with Surdex in April 2024.

22.     On or about April 3, 2024, the parties filed "Articles of Merger" with Missouri's Secretary of State that identified Surdex as the "surviving corporation" of the merger between Bowman Atlas LTD. and Surdex.

23.     Through this process, Bowman acquired 100% of Surdex's assets, liabilities, workforce, and operations, and Surdex survived as a wholly owned subsidiary of Bowman.

24.     In the early stages of the acquisition, Defendants transitioned Surdex's workforce, including Plaintiff and the Putative Collective Action Members, to a third entity: Hoffmann Aviation Services, Inc. ("Hoffmann").

25.     Hoffmann was a transition entity that Defendants created for the purpose of maintaining Surdex's flight operations during the acquisition process and avoiding any gap in their aerial mapping and surveying services.

26.     After the acquisition, Defendants transitioned their survey pilots to Bowman, effective on or about December 2, 2025. Defendants issued survey pilots new offers of

4

employment and onboarded them as Bowman employees around this time.

27.     Regardless of whether Defendants characterized the survey pilots as being formally employed by Surdex, Hoffmann, and/or Bowman, Defendants' survey pilots continued flying the same aircraft, on the same schedules, for the same customers, under the same operational control, and under the same compensation structure. The flight operations business never ceased operating and remained under the same management and control the entire time.

28.     To this day, Surdex exists as an operational shell company performing the same aerial surveying and mapping business with survey pilots employed by Bowman.

29.     Throughout 2024 and 2025, Surdex, Hoffmann, and Bowman had common ownership, common management, centralized control of labor relations, and interrelated operations. Indeed, Defendants' respective Secretary of State filings reflect overlapping officers and board members between Surdex and Hoffmann preceding the acquisition and overlapping officers and board members between Surdex and Bowman following the acquisition.

30.     Surdex, Hoffman, and Bowman all exercised control over survey pilots' work throughout the statutory period, including by exercising control over flight operations, scheduling, and compensation policies.

31.     Accordingly, Surdex, Hoffmann, and Bowman operated as a single integrated enterprise and/or were joint employers with respect to Plaintiff and the Putative Collective Action Members for purposes of federal and state wage laws.

32.     Defendants are also liable to Plaintiff and the Putative Collective Action Members as one another's successors in interest.

33.     Defendants transitioned their survey pilots twice: once from Surdex to Hoffmann while the Bowman/Surdex acquisition took place, and again from Hoffmann to Bowman after the

Bowman/Surdex acquisition was complete. Defendants maintained full continuity of operations during both transitions, using the same workforce, and servicing the same clients without interruption.

34. Defendants had notice of one another's wage and hour practices yet continued the same flight operations without interruption and continued misclassifying survey pilots as exempt from overtime compensation across both transitions.

35. As a result, each defendant is liable as a successor-in-interest for the wage and hour violations of the other defendants.

## COLLECTIVE AND CLASS ACTION ALLEGATIONS

36. Plaintiff brings Count I, the FLSA claim, as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b) on behalf of himself and the following group of Putative Collective Action Members:

> All of Defendants' current or former survey pilots, including individuals who performed the position(s) of Survey Pilot I, Survey Pilot II, or Survey Pilot III, during the three-year period preceding the commencement of this action to present.

37. The FLSA claim may be pursued by those who opt-in to this case, pursuant to 29 U.S.C. § 216(b).

38. To the extent required by law, Plaintiff requests notice be provided to Putative Collective Action Members via first class mail, email, physical posting and/or by any form of notice similar to those customarily used in representative actions.

## FACTS COMMON TO ALL COUNTS

39. Defendants operate an aerial mapping and surveying business utilizing a fleet of single-engine, multi-engine, and turbo engine aircraft.

*Defendants' Survey Pilots*

40.     Defendants employ survey pilots to perform aerial mapping, surveying, and imaging operations for Defendants' commercial and governmental clients, including the United States Department of Agriculture, various state and local governmental entities, and private customers.

41.     Defendants employ three levels of survey pilots, designated as Survey Pilot I, Survey Pilot II, and Survey Pilot III.

42.     The "Survey Pilot I" designation is for individuals who are only certified to fly single-engine aircraft.

43.     The "Survey Pilot II" designation is for individuals who are certified to fly multi-engine aircraft but not turbo engine aircraft.

44.     The "Survey Pilot III" designation is for individuals who are certified to fly turbo engine aircraft.

45.     Defendants' survey pilots all have the same essential job functions and duties, regardless of their respective titles and certifications. The only difference among them concerns the size of the planes they operate.

46.     Defendants do not require their survey pilots to possess a specialized degree related to piloting aircraft as a condition of employment.

47.     Rather, survey pilots obtain their respective licenses and certifications through a combination of practical flight training, simulator time, supervised flight hours, and FAA testing requirements.

48.     The certification process for survey pilots is focused on developing operational proficiency through hands-on training and accumulated flight time, rather than academic study or

advanced degree programs.

49.    Defendants' survey pilots work on a rotating schedule of 15 consecutive days on duty followed by thirteen 13 consecutive days off duty.

50.    During their on-duty rotations, Defendants' survey pilots regularly work well over 40 hours per workweek.

51.    Defendants pair each survey pilot with another employee – a "sensor operator" – who accompanies the survey pilot on flights to perform mapping, surveying, and imaging work.

52.    Defendants classify their sensor operators as non-exempt from overtime.

53.    For their day-to-day responsibilities, Defendants' survey pilots are primarily responsible for flying Defendants' aircraft along predetermined survey routes while sensor operators run survey cameras and data-collection equipment on the land below the plane.

54.    For the vast majority of each workday, Defendants' survey pilots fly at a fixed altitude and speed with the aircraft on autopilot.

55.    Defendants' survey pilots fly predetermined flight patterns that are established by Defendants' survey planners based on the individual project's specifications.

56.    Outside of flight time, Defendants' survey pilots also perform limited administrative tasks incidental to flight operations, such as participating in conference calls with Defendants' leadership team and schedulers, reviewing weather reports, completing pre-flight inspections, logging flight hours, and submitting post-flight paperwork.

57.    Once airborne, however, the survey pilots' role is largely to monitor the aircraft's systems and maintain course while the sensor operator controls the surveying equipment.

58.    Most of survey pilots' workday involves flying Defendants' aircraft on autopilot along predetermined routes, with minimal exercise of independent judgment beyond maintaining

standard aviation safety procedures and monitoring equipment.

59.　　Survey pilots' work constitutes production work directly related to Defendants' core revenue-generating business of aerial mapping, surveying, imaging, and data collection – not administrative work related to management or general business operations.

60.　　Defendants' survey pilots regularly work more than 12 hours per day for extended periods, particularly when weather conditions allow for continuous flight operations.

61.　　Defendants have paid and continue to pay their survey pilots less than $107,432 per year on a salary basis.

62.　　Defendants have misclassified and continue to misclassify all their survey pilots – including those designated as Survey Pilot I, Survey Pilot II, and/or Survey Pilot III – as exempt from overtime compensation and have failed to pay survey pilots overtime compensation for work performed in excess of 40 hours per week.

### *Plaintiff Jeffrey Clarke*

63.　　Plaintiff Clarke began working for Surdex in 2018 as a Survey Pilot III, flying a turboprop engine aircraft.

64.　　In around early 2024, Defendants forced Plaintiff Clarke to transition to Hoffmann while Defendants executed the Surdex/Bowman acquisition.

65.　　In 2023, 2024, and 2025, Defendants paid Plaintiff Clarke approximately $91,000 per year on a salary basis.

66.　　Defendants also paid Plaintiff Clarke a discretionary bonus each year in 2023, 2024, and 2025.

67.　　Plaintiff Clarke did not know how much the discretionary bonus would be until it was paid; he never knew when it was going to be paid; and he was not aware of any specific terms

or conditions he had to satisfy to be eligible to receive the discretionary bonus.

68.     Even including the discretionary bonus payments, Plaintiff Clarke earned approximately $102,000 in 2023 and $106,300 in 2024.

69.     Plaintiff Clarke was not a highly compensated employee under the FLSA.

70.     Plaintiff Clarke worked rotating schedules of 15 consecutive days on duty followed by 13 consecutive days off duty.

71.     Like all Defendants' survey pilots, Plaintiff Clarke was primarily responsible for flying Defendants' aircraft along predetermined routes while a sensor operator ran survey cameras and data-collection equipment on the land below the plane.

72.     For the vast majority of each workday, Plaintiff Clarke flew at a fixed altitude and speed with his assigned aircraft on autopilot.

73.     Plaintiff Clarke flew predetermined flight patterns that were established by Defendants' survey planners based on project specifications.

74.     Outside of flight time, Plaintiff Clarke performed limited administrative tasks incidental to flight operations, such as participating in conference calls with Defendants' leadership team and schedulers, reviewing weather reports, completing pre-flight inspections, logging flight hours, and submitting post-flight paperwork.

75.     Plaintiff Clarke's limited administrative tasks occupied only a small fraction of his typical workday.

76.     In around September 2025, Plaintiff Clarke applied for and was approved for leave under the Family Medical Leave Act ("FMLA") while working for Defendants. In the weeks that followed, Plaintiff Clarke communicated about his leave and potential return to work with an HR representative whose email signature block indicated she was a Bowman employee with a

Bowman email address.

77.    In November 2025, Defendants provided all survey pilots, including Plaintiff Clarke, a memorandum explaining that all survey pilots would be onboarded to Bowman effective December 2, 2025.

78.    Effective December 16, 2025, however, Defendants terminated Plaintiff Clarke's employment when he attempted to return to work following his period of FMLA leave.

79.    Plaintiff Clarke was among Defendants' most senior survey pilots at the time.

80.    Given his seniority and turbo-engine certification, Plaintiff Clarke was likely among Defendants' highest earning survey pilots.

81.    Defendants misclassified Plaintiff Clarke as "exempt" from overtime and failed to pay Plaintiff Clarke for overtime compensation for work performed over 40 hours in a workweek.

82.    All actions or inactions of or by Defendants occurred by or through their agents, servants, or employees, as set forth herein.

## COUNT I
## FAILURE TO PAY OVERTIME COMPENSATION IN VIOLATION OF THE
## FAIR LABOR STANDARDS ACT 29 U.S.C. § 207, *et seq*

**(By Plaintiff Clarke on Behalf of Himself and All Others Similarly Situated)**

83.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as though fully stated herein.

84.    At all times relevant, Plaintiff and the Putative Collective Action Members have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. §§ 201, *et seq*.

85.    Defendants are subject to the overtime pay requirements of the FLSA because they are enterprises engaged in interstate commerce and their employees are engaged in commerce.

86.     At all times relevant, Defendants have been and continue to be an "employer" of Plaintiff and the Putative Collective Action Members within the meaning of the FLSA, 29 U.S.C. § 203.

87.     At all times relevant, Defendants had gross operating revenues in excess of $500,000.00.

88.     Section 13 of the FLSA, codified at 29 U.S.C. § 213, exempts certain categories of employees from overtime pay obligations, but none of the exemptions applied to Plaintiff or the Putative Collective Action Members.

89.     Nevertheless, Defendants misclassified Plaintiff and the Putative Collective Action Members as "exempt" from the FLSA's overtime requirements throughout their respective employment with Defendants.

90.     Plaintiff and the Putative Collective Members have substantially similar job requirements and compensation structures and are subject to Defendants' common policy and practice of misclassifying its survey pilots as exempt from overtime and refusing to pay earned overtime wages in violation of the FLSA.

91.     For many weeks of Plaintiff and the Putative Collective Action Members' employment with Defendants, they worked more than forty hours per week.

92.     At all times relevant, Defendants' offices and supervisors knew or should have known of Plaintiff and the Putative Collective Action Members' unpaid overtime compensation.

93.     Defendants' violation of the FLSA is continual in nature, in that Defendants continue to pay Putative Collective Action Members under the same unlawful policies and procedures that are set forth in detail herein.

94.     Defendants' conduct constitutes a willful violation of the FLSA within the meaning

12

of 29 U.S.C. § 255(a).

95.     Defendants have acted neither in good faith nor with reasonable grounds to believe that their actions and omissions were not a violation of the FLSA, and as a result, Plaintiff and the Putative Collective Action Members are entitled to recover an award of liquidated damages in an amount equal to their amount of unpaid overtime. Alternatively, should the Court find Defendants did not act willfully in failing to pay overtime pay, Plaintiff and the Putative Collective Action Members are entitled to an award of prejudgment interest at the applicable legal rate.

WHEREFORE, Plaintiff Clarke, on behalf of himself and the Putative Collective Action Members, respectfully prays this Court for the following relief:

a.     Issuance of notice to all Putative Collective Action Members informing them of their right to file consents to join the FLSA portion of this action;

b.     An award of compensatory and liquidated damages under 29 U.S.C. § 216(b);

c.     Pre-judgment and post-judgment interest as provided by law;

d.     Reasonable attorneys' fees and costs as allowed by Section 216(b) of the FLSA;

e.     A declaration that Defendants have violated state and federal law; and

f.     Such other relief as the Court deems fair and equitable.

## COUNT II
### FAILURE TO PAY OVERTIME COMPENSATION
### IN VIOLATION OF THE MMWL § 290.505(1) R.S.Mo.

**(By Plaintiff Clarke on Behalf of Himself Only)**

96.     Plaintiff Clarke incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as though fully stated herein.

97.     The Missouri Minimum Wage Law ("MMWL") requires each covered employer, such as Defendants, to compensate all non-exempt employees for services performed at the proper

13

rate of pay and to compensate them at a rate of not less than one and one-half times the regular rate of pay for work performed over forty hours in a workweek.

98.    At all times relevant, Plaintiff Clarke was entitled to the rights, protections, and benefits provided under the MMWL.

99.    Defendants are subject to the overtime pay requirements of the MMWL and Defendants employed Plaintiff Clarke during the applicable statutory period for MMWL claims.

100.    The MMWL incorporates the FLSA's overtime exemptions by reference in R.S.Mo. § 290.505(3).

101.    Because no FLSA exemption applies to Plaintiff Clarke, Defendants also misclassified Plaintiff Clarke as "exempt" from the overtime requirements under the MMWL.

102.    For many weeks of Plaintiff Clarke's employment with Defendants, Plaintiff Clarke worked more than forty hours per week.

103.    At all times relevant, Defendants' officers and supervisors knew or should have known of Plaintiff Clarke's unpaid overtime.

104.    Defendants' failure to properly compensate Plaintiff Clarke for overtime compensation constitutes a violation of the MMWL, R.S.Mo. § 290.500, *et seq*.

105.    Plaintiff Clarke seeks damages in the amount of all unpaid overtime wages, plus an additional amount equal to twice the unpaid wages as liquidated damages (i.e., treble damages), pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses incurred in this action, to be paid as provided by the R.S.Mo. § 290.500, *et seq*.

WHEREFORE, Plaintiff Clarke, on behalf of himself only, respectfully prays this Court for the following relief:

a.    An award of compensatory damages in the full amount of unpaid wages and "an

14

additional amount equal to twice the unpaid wages as liquidated damages," as provided by Missouri law;

b.  Costs and expenses of this action incurred herein;

c.  Reasonable attorneys' fees and expert fees;

d.  Pre-Judgment and Post-Judgment interest, as provided by law; and

e.  Such other relief as the Court deems fair and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff Clarke, on behalf of himself and the Putative Collective Action Members, requests a trial by jury on all counts and allegations of wrongful conduct alleged herein.

Dated: January 21, 2025                         Respectfully submitted,

  /s/ John F. Doyle
Daniel L. Doyle, MO Bar No. 37305
John F. Doyle, MO Bar No. 66626
Brittany K. Ussery, MO Bar No. 76098
DOYLE & BRUCE LLC
748 Ann Avenue
Kansas City, Kansas 66101
(913) 543-8558
(913) 543-3888 Facsimile
Daniel@KCLaw.com
John@KCLaw.com
Brittany@KCLaw.com

***Counsel for Plaintiff and
the Putative Collective Members***